**Daniel Snyder, OSB No. 783856**
dansnyder@lawofficeofdanielsnyder.com
**Paul Bastian, OSB No. 062706**
paul@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249
        Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **EMILY LINDSEY,** | Case No. 1:24-cv-946 |
| **PLAINTIFF**, | **COMPLAINT** |
| v. | UNLAWFUL EMPLOYMENT ACTION |
| | Title VII Discrimination and retaliation; Equal Pay Act; and supplemental state law claims |
| **ENTRUST CORPORATION,** | |
| **DEFENDANT**. | **JURY TRIAL DEMANDED** |

### I. PRELIMINARY STATEMENT

1.     Plaintiff Emily Lindsey brings this action to remedy violations of Plaintiff's statutory rights under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, 42 USC §2000e *et seq.*; the Equal Pay Act of 1963 as amended; and supplementary state

PAGE 1 – COMPLAINT AND DEMAND FOR JURY TRIAL

claims which arise out of the same common nucleus of operative facts. Plaintiff seeks equitable relief, including economic and noneconomic damages, attorneys' fees, and costs.

## II. JURISDICTION

2.      Jurisdiction is conferred upon this Court by 28 USC § 1331, federal question jurisdiction, and 28 USC §1343, civil rights jurisdiction.

3.      Plaintiff requests this Court invoke its supplemental jurisdiction pursuant to 28 USC § 1367 concerning all causes of action based on Oregon statutory provisions or the common law as the Oregon claims arise from the same nucleus of operative facts as the federal claims.

4.      All preconditions to jurisdiction pursuant to 42 USC § 2000e-5 have been satisfied.

a.      On or about March 14, 2023, Plaintiff filed a charge of employment discrimination and retaliation with the Oregon Bureau of Labor and Industries Civil Rights Division (BOLI CRD) for gender discrimination and retaliation, discriminatory wage rates, and whistleblower retaliation under Oregon law, Case No. EEEMSX230314-60297. On June 28, 2023, Plaintiff filed a supplemental complaint with BOLI CRD in the same case number.

b.      On or about March 20, 2023, BOLI CRD co-filed charges for Plaintiff with the Equal Employment Opportunity Commission (EEOC), charge number 38D-2023-00537.

c.      On March 14, 2024, BOLI CRD issued a notice of suit rights letter to Plaintiff for Case No. EEEMSX230314-60297.

PAGE 2 – COMPLAINT AND DEMAND FOR JURY TRIAL

d.   On April 4, 2024, the EEOC issued Plaintiff a dismissal and notice of suit rights for charge number 38D-2023-00537. The EEOC issued the dismissal and notice of suit rights without investigating the charge and without making any findings as to the merits of the charge.

e.   Plaintiff has pending charges with BOLI and the EEOC for which notice of suit rights letters have been requested. On February 7, 2024, Plaintiff filed a second supplemental complaint, adding allegations of violation of the Oregon Rehabilitation Act, Title VII, and Title I of the Americans with Disabilities Act. BOLI-CRD assigned the Case No.: DPEMDP240208-60280 and co-filed with the EEOC, Case No.: 38D-2024-00460.

5.   The venue is in the District of Oregon pursuant to 28 USC § 1391(b) because the claim arose in this Judicial District. The venue is appropriate in the Medford Division since Plaintiff worked in Curry County, Oregon.

### III. <u>PARTIES</u>

6.   In addition to Plaintiff's federal claims, there is complete diversity of citizenship between the parties. The amount in controversy exceeds $75,000.

7.   Plaintiff Emily Lindsey is a citizen of the United States. At all times material, Plaintiff resided in and worked for Defendant in Curry County, Oregon; first in Port Orford, then in Gold Beach, Curry County. Since October 2023, Plaintiff has resided in the town of Langlois, also in Curry County, Oregon.

8.   Defendant Entrust Corporation is a Delaware corporation registered for business in Oregon. Defendant does regular and sustained business in Oregon. Said Defendant does business in multiple states and also has international locations.

PAGE 3 – COMPLAINT AND DEMAND FOR JURY TRIAL

9.    At all times relevant, Defendant's owners, officers, employees, and supervisors, as their conduct as set forth herein, were acting within the course and scope of their employment with Defendant.

## IV. GENERAL FACTUAL ALLEGATIONS

10.    Defendant is engaged in the business of financial security, security, digital products, hardware products, and proprietary software.

11.    Plaintiff is a female employee of Defendant. Plaintiff has many years of experience working in information technology. Plaintiff holds a Project Management Professional (PMP) certification from the Project Management Institute. Plaintiff has also earned a master's degree in computer science.

12.    Before working for Defendant, Plaintiff worked as a manager in the information technology department for a large retail company. Plaintiff has also provided information technology services and technical project management to various clients, including for US government projects, such as the Comptroller of the Currency.

13.    Plaintiff suffers from multiple disabilities, to wit: Post-Traumatic Stress Disorder (PTSD), depression, anxiety, and physical trauma to her spine, muscles, and ligaments. Her medical conditions subject her to pain and discomfort as well as physical limitations. Her medical conditions significantly impair one or more major life activities, including, but not limited to, sleeping, driving, and traveling.

14.    In 2015, Defendant Entrust hired Plaintiff as an implementation specialist at Defendant's office in Englewood, Colorado. An implementation specialist configures and installs custom software packages related to credit and debit card issuance by financial institutions in the banking industry.

PAGE 4 – COMPLAINT AND DEMAND FOR JURY TRIAL

15.     Throughout her employment, Plaintiff has received different treatment from Defendant based on gender. Before Defendant hired her, Defendant required Plaintiff to complete three interviews and to demonstrate her proficiency and specialized knowledge for the position. After Defendant hired Plaintiff, she learned that Defendant did not typically require male applicants for the same position to submit to three interviews and demonstrate their proficiency.

16.     In 2016, Defendant transferred Plaintiff to a specialized support team. Defendant assigned Plaintiff to perform duties and responsibilities that are part of a project management role. Defendant made these assignments on an ad hoc basis for specific customers.

17.     For years, Defendant has continued to assign advanced roles and duties to Plaintiff without promoting her, selecting her for open promotional positions, or increasing her compensation. Defendant discriminated against Plaintiff and continued to discriminate against Plaintiff by failing to promote her to Project Manager or Program Manager; by failing to pay Plaintiff equal and appropriate compensation for her duties; and by requiring Plaintiff to perform higher-level work than males in her job classification. Defendant passed over Plaintiff for promotion, promoting males and paying males more for the duties Plaintiff performed.

18.     In April 2016, Plaintiff complained to managers about the unfair disparity between her work duties assigned to her, her job title, and the compensation package. She complained again in May 2016 when Entrust assigned her another large project.

19.     On June 6, 2016, Plaintiff had her first yearly review. Defendant gave Plaintiff a pay increase in line with the standard yearly increases for the job support technician title or classification but not commensurate with Plaintiff's actual responsibilities and duties. Defendant's 2016 review did not address that Plaintiff was being directed to and was functioning

PAGE 5 – COMPLAINT AND DEMAND FOR JURY TRIAL

daily as a project manager or program manager rather than as a support technician. Plaintiff told the male supervisor that she was tasked to complete a job role at least two levels above her own, without the pay or the title of that role, and that Defendant did not have the same expectation of the males who were Plaintiff's support technician peers.

20.     On January 25, 2017, Plaintiff was awarded Defendant's Fiscal Year 2017 Customer-Focused Award. The Customer-Focused Award was Defendant's highest employee award.

21.     On June 7, 2017, Plaintiff received an early performance review with a positive rating. On June 11, 2017, Defendant's senior leadership nominated Plaintiff to serve on Defendant's Colleague Advisory Board, a group that met periodically to improve the functioning and work culture of the organization.

22.     Plaintiff informed Corbin Cook, her supervisor, and Douglas Barton, her manager, that she and her husband planned to move to Oregon, and she wanted to work remotely. Plaintiff informed them that her husband was retiring and wanted to live in Curry County. Both Plaintiff's supervisor and manager told Plaintiff they fully supported Plaintiff's goal to work remotely from Oregon 100% of the time. They told Plaintiff that she could work anywhere with an internet connection.

23.     On June 6, 2018, Plaintiff received a yearly review with high ratings. Plaintiff reminded her supervisor, Mr. Cook, that her move to Oregon was upcoming in the next few months. In the summer of 2018, based on the support she received from Mr. Cook and Mr. Barton to allow remote work, Plaintiff sold her home in Colorado to prepare for her remote work in Oregon.

PAGE 6 – COMPLAINT AND DEMAND FOR JURY TRIAL

24.    On August 2, 2018, Plaintiff had a conversation with Corbin Cook about taking Paid Time Off (PTO) as vacation days. Plaintiff told Mr. Cook that she planned to be on vacation from August 30, 2018, through September 7, 2018, to move to Oregon. Mr. Cook said that he had learned that Michael Priest, Defendant's Vice President of Global Service Delivery, had suddenly and unexpectedly denied remote work for Plaintiff. Mr. Cook told Plaintiff that Mr. Priest said that Defendant would terminate Plaintiff if she moved to Oregon. Plaintiff explained that she had sold her home and made plans to move on assurance that she could work remotely.

25.    In 2018, Plaintiff reported to Cara Bristow in Human Resources that Mr. Priest was engaging in gender discrimination toward her by suddenly denying remote work, which her supervisor and manager had previously approved. Plaintiff reported comparator employees, who had received preferential treatment because of their gender, to Ms. Bristow. Plaintiff reported that two male support technicians, Tristan Pierce and James Durkee, had already been approved to work remotely by Patrick Butkovich, Director of Instant Financial Issuance Implementation and Support. After her initial conversation with Ms. Bristow, Plaintiff learned that another male employee Karl Jentzsch, moved from Colorado to California to work remotely without permission. After Plaintiff complained to Ms. Bristow in Human Resources about gender discrimination, her request for remote work was granted.

26.    On August 7, 2018, Plaintiff reported to Ms. Bristow that gender discrimination was directed at her by Defendant's Sales Associate, Matthew Riazzi.

27.    It was not until August 30, 2018, that Defendant officially changed Plaintiff's employment status to a full-time remote employee working in Oregon. Plaintiff was directed to perform all necessary business functions remotely and not to expense travel to any Entrust office.

PAGE 7 – COMPLAINT AND DEMAND FOR JURY TRIAL

28.     On October 1, 2019, Plaintiff was assigned responsibility for the migration program from USBank Elan to FIS TransFund. These responsibilities and roles are that of a Senior Program Manager. However, Defendant did not promote Plaintiff or give her pay increases at the same rate as her lesser-performing male colleagues. In that project, Plaintiff was solely responsible for this complex program necessary for Defendant's product to interface correctly with other industry-leading vendor systems. While implementing the data migration program from USBank Elan to FIS TransFund, Plaintiff was also required to perform project manager functions. Plaintiff had a caseload far higher than that of her lesser-performing male colleagues. Defendant also tasked Plaintiff with continuing to complete the duties of a support technician, the job Defendant classified her in. Plaintiff worked additional hours to complete the increased workload.

29.     On February 2, 2021, Patrick Butkovich, Director of Instant Financial Issuance Implementation and Support, notified Plaintiff that she needed to meet and perform under new policy and procedure changes. The new metrics were those of a project manager. Although Defendant made Plaintiff accountable for performing under project manager criteria or metrics, Defendant did not give Plaintiff the commensurate title, salary, and benefits. To Plaintiff's best knowledge, Defendant did not require male employees to meet the responsibility and metrics of a project manager while being paid and titled as support technicians.

30.     On February 5, 2021, during the project team's weekly project meeting, Plaintiff's direct supervisor, Mr. Cook, reiterated that Plaintiff was required to meet the new metrics and that Plaintiff would be solely responsible for all projects assigned to her. Mr. Barton and Mr. Cook proposed assigning Plaintiff more than three hundred projects simultaneously. Plaintiff emailed Mr. Cook and Mr. Barton that she would only accept being the sole responsible party for

PAGE 8 – COMPLAINT AND DEMAND FOR JURY TRIAL

all the projects if Plaintiff's title was changed to Project Manager and she was assigned a team of people to support her. Plaintiff did the projects as directed but her title was not changed.

31.    Plaintiff was the only female on her team of support technicians. Defendant continued not to remedy Plaintiff's gender complaints about promotion and pay. Rather than remedying the gender discrepancies Plaintiff reported and changing her title, Entrust continued to assign her discrete "tasks" that were those of a project manager or program manager without reducing her workload. To the best of Plaintiff's information and belief, none of her similarly situated male colleagues were tasked with such an ever-increasing workload while not being promoted and given additional staffing resources.

32.    Although Defendant had a formal training department, Defendant assigned Plaintiff to train male employees how to perform work. Defendant failed to give Plaintiff any resources, extra compensation, or acknowledgment in the trainer role. None of her male colleagues were assigned this additional training work.

33.    On June 3, 2021, Plaintiff and all other members of her team were moved to an implementation team. When Plaintiff was moved to the implementation team, she told Benoit Lemercier, Director of Service Delivery, now Senior Director of Professional Services, Product Management, and Strategy, that she was interested in being advanced to an implementation supervisor position. Mr. Lemercier responded by pledging not to hire a senior implementation supervisor without posting the position and considering Plaintiff for the position.

34.    On June 24, 2021, Mr. Lemercier announced on a Teams video call that he was hiring a new senior implementation manager. Mr. Lemercier said this new senior implementation manager would determine who would be promoted to the two available implementation supervisor positions.

PAGE 9 – COMPLAINT AND DEMAND FOR JURY TRIAL

35.    On June 28, 2021, Plaintiff initiated a call with Mr. Lemercier to address the more than a hundred projects assigned to her. Plaintiff told Mr. Lemercier that each project listed Plaintiff as the project manager and assigned her individual responsibility for completing these projects. Plaintiff reported that she had been tasked to perform these projects alone and without the appropriate pay and title while still performing support specialist technician duties such as emergency on-call and phone support. Mr. Lemercier told Plaintiff that he could not take corrective action to lessen Plaintiff's workload until a new senior implementation manager had been hired.

36.    In June 2021, one of Defendant's male customers abused Plaintiff based on gender. The customer demanded that he "speak to a man." Plaintiff reported the customer's gender discrimination to Cara Bristow in Human Resources. Defendant responded by removing Plaintiff from contact with the customer rather than making the customer accountable for the misconduct.

37.    On July 6, 2021, Mr. Lemercier told Plaintiff during a telephone call that a full review and update of job titles would be performed. Mr. Lemercier promised that her job title would be updated. On July 8, 2021, during another telephone call with Mr. Lemercier, Plaintiff again requested a new title, pay package, position description, job duties, and responsibilities for the project manager duties she was performing. On July 29, 2021, Plaintiff emailed Mr. Lemercier requesting the new title, pay package, position description, job duties, and responsibilities for the project manager duties she was performing. On July 30, 2021, Mr. Lemercier emailed Plaintiff, responding that he received Plaintiff's email requesting her new employment package. Mr. Lemercier said Plaintiff would see a result within "a few weeks."

PAGE 10 – COMPLAINT AND DEMAND FOR JURY TRIAL

38. On August 9, 2021, Mr. Lemercier promoted Michael Beaumont and Shane Blea, both of whom are males, to implementation supervisor roles. Mr. Lemercier bypassed Plaintiff completely and promoted those males despite his pledge that the new senior implementation manager would be involved in hiring the two senior implementation supervisors; that there would be an open selection process; and that Plaintiff would be interviewed.

39. On September 13, 2021, Plaintiff participated in a telephone call with Mr. Lemercier. Plaintiff again asked for the appropriate pay and promotion for the program manager duties she was performing. Although Plaintiff had not said she was unhappy with her team assignment, Mr. Lemercier said that Plaintiff could attempt to transfer from the implementation team to the project team if she was not happy with her current assignment, but he did not feel she would be happy with the project team either. Plaintiff said that she was not unhappy with her team, but that she was performing as a program and project manager, that her contributions should be recognized, and she should not be required to seek a transfer to be treated fairly. Plaintiff told Lemercier that her reasonable expectation was that Defendant would pay her fairly for the work expected of her and that she felt singled out because of her gender since the male support technicians were being given the same responsibilities and treatment.

40. On October 5, 2021, Plaintiff sent Mr. Lemercier an email follow-up to their September 13, 2021 telephone conversation. Mr. Lemercier did not reply to her email. Plaintiff also requested a meeting with Human Resources to discuss her employment package and the illegal discrimination she was suffering.

41. Because Mr. Lemercier had not responded to her October 5, 2021, email, Plaintiff sent him an October 8, 2021, follow up email. Plaintiff copied Human Resources on this email. Mr. Lemercier and Ellen Mattia, Human Resources, agreed to schedule a meeting with Plaintiff

PAGE 11 – COMPLAINT AND DEMAND FOR JURY TRIAL

on October 20, 2021, to discuss her concerns. On October 20, 2021, Ms. Mattia and Mr. Lemercier canceled the scheduled meeting.

42.     On October 22, 2021, Mr. Lemercier assigned Plaintiff responsibility for the flagship project, SymXchange, the most extensive program ever handled by the division. SymXchange is a system migration program involving over four hundred (400) financial institutions. Plaintiff performed the functions of both a project manager and a program manager in this enormous endeavor. Plaintiff requested additional resources, including help from the sales division and multiple technicians. Defendant ignored her requests. None of the other technicians, all male, were required to perform program and project manager duties while still being tasked and paid as technicians.

43.     On October 29, 2021, Plaintiff called Ms. Mattia in Human Resources and Mr. Lemercier to complain about the unfair pay she was receiving for the job duties she performed. Mr. Lemercier and Ms. Mattia told Plaintiff that Plaintiff's job responsibilities and compensation would not be changing.

44.     After the October 29, 2021, telephone call, Defendant retaliated against Plaintiff by increasing Plaintiff's duties. Mr. Lemercier assigned Plaintiff three other migrations programs: VisaDPS Legacy to Enhanced, JackHenry to jXchange, and Symitar to SymXchange. Mr. Lemercier requested weekly updates from Plaintiff on these programs, obviously continuing to use Plaintiff as program manager and increasing her prodigious and unique workload.

45.     Thereafter, Plaintiff continued managing projects while performing support escalation responsibilities, which included technical work. Plaintiff's male colleagues were not tasked by Defendant with the same level of project management, program management, and

PAGE 12 – COMPLAINT AND DEMAND FOR JURY TRIAL

technical work as Plaintiff was without being promoted to a project manager, in both title and pay.

46.     Mr. Lemercier had a weekly stand-up call with employees. A stand-up call is call is a fundamental tool designed to help complex programs and projects succeed. On November 1, 2021, Plaintiff attempted to interact with Mr. Lemercier during a weekly stand-up call. Mr. Lemercier responded by saying that he did not need to be on the calls because Debra Vera and Plaintiff, as "Project Managers," could update senior leadership on the progress.

47.     On November 11, 2021, Ms. Mattia in Human Resources sent Plaintiff a follow-up email to their call on October 29, 2021. Ms. Mattia wrote that it would be a few weeks before new pay and title information was made available for Plaintiff.

48.     On November 19, 2021, Brian Platt, a male, started work at Defendant as a senior implementation manager. Plaintiff's experience, project management certification, and advanced education exceed Mr. Platt's qualifications. Mr. Platt became Plaintiff's direct supervisor. Mr. Platt worked remotely from his home in Wisconsin.

49.     On or around November 22, 2021, Plaintiff spoke with Mr. Platt by telephone. Mr. Platt asked Plaintiff to take a flight to Denver and meet with him at Defendant's Englewood, Colorado office. Plaintiff replied that her remote working contract prohibited her from traveling to an Entrust Office on company business. Mr. Platt did not offer to obtain an exception to the no-travel policy so that Plaintiff could meet him in Colorado.

50.     On November 22, 2021, as Mr. Platt continued to press Plaintiff for a meeting, Plaintiff informed Mr. Platt that Plaintiff avoids flying because she suffers from multiple disabilities, including Anxiety and a neck injury that substantially impairs her ability to sit for extended periods, making extended flights excruciatingly uncomfortable. Plaintiff asked if they

PAGE 13 – COMPLAINT AND DEMAND FOR JURY TRIAL

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

could meet through video because of her disabilities. Mr. Platt denied Plaintiff's request for accommodation.

51.    On November 22, 2021, Mr. Platt told Plaintiff that she should just rent a car and drive from her home in Southern Oregon to Defendant's office in Colorado for the meeting. Mr. Platt added that they could go out to dinner together and get to know each other. Plaintiff explained that it would be painful for her to make a long trip by automobile. Plaintiff volunteered again that she was always available to meet Platt virtually by videoconference. Mr. Platt did not schedule a Zoom meeting so that they could become acquainted. Mr. Platt took no action to have an interactive process meeting with Plaintiff. Defendant has failed to have an interactive process meeting with Plaintiff.

52.    On December 1, 2021, Plaintiff sent an updated email to Ms. Mattia in Human Resources and Mr. Lemercier requesting that Plaintiff's title and pay be adjusted to fair levels. Mr. Lemercier once again ignored her email.

53.    On December 10, 2021, Mr. Lemercier and Mr. Platt retaliated against Plaintiff by assigning her responsibility for the entirety of the Symitar to SymXchange Migration Program. The SymXchange Migration Program requires close cooperation with multiple vendors as they are installing interrelated computer systems. Acting on Mr. Lemercier's request, Plaintiff contacted Patrick Tabourin, Defendant's Alliances Relation Manager, to engage with the vendors involved in the SymXchange program. Mr. Tabourin ignored Plaintiff's inquiry, which Plaintiff reported to Mr. Platt. Plaintiff explained that Mr. Tabourin ignored her inquiry because her job title on the company employee listing was implementation technician rather than project or program manager which would have alerted Mr. Tabourin as to Plaintiff's crucial role in the

PAGE 14 – COMPLAINT AND DEMAND FOR JURY TRIAL

SymXchange migration program. Mr. Platt dismissed Plaintiff and did not acknowledge that Mr. Tabourin's lack of response was a problem.

54.     On December 13, 2021, Plaintiff emailed Mr. Platt and Mr. Lemercier, writing that she expected to be promoted to an elevated position within the team. Plaintiff wrote that her role and responsibilities, based simply on tasks, projects, and programs assigned, were more significant than any of the other team members who, like Plaintiff, had been with Entrust for four years or more. Mr. Platt and Mr. Lemercier ignored Plaintiff's email.

55.     On December 14, 2021, Defendant announced that it was changing the title of all employees on Plaintiff's team to senior implementation specialist and that they would all become salaried rather than hourly employees. The job title and compensation plan change were to control expenses by converting hourly employees to salaried employees to save on overtime pay and not as promotions.

56.     On December 14, 2021, Plaintiff informed Mr. Platt of her disappointment that she was not made a project manager, much less a program manager. Plaintiff told Mr. Platt that she felt she was qualified for promotion to principal implementation specialist position as she was the team's openly acknowledged subject matter expert (SME). Mr. Platt responded by directing Plaintiff to train her replacement. Plaintiff asked Mr. Platt if he was reducing her other assignment responsibilities so she could train another employee to perform her job duties. Mr. Platt told Plaintiff that he was not reducing her assignments and that her job performance would be evaluated on the trainee's success, i.e. the trainee's ability to perform at Plaintiff's level.

57.     In December 2021, Kirkland Follis, a former employee of Defendant, returned to employment at Defendant as a principal implementation specialist, a position Plaintiff sought to be promoted into. Defendant did not post the principal implementation specialist opening.

PAGE 15 – COMPLAINT AND DEMAND FOR JURY TRIAL

Therefore, Plaintiff could not apply for the position. Mr. Follis worked remotely from Alabama, a state where Defendant does not have an office. Around that time, Defendant rehired Mr. Follis' domestic partner, Samantha Verhine, who worked remotely from Alabama.

58.     On December 16, 2021, Samantha Verhine assigned Plaintiff responsibility for a closed project. Because the project was closed, Plaintiff could not complete the project. However, having an uncompleted project assigned to Plaintiff skewed her work metrics negatively. Work metrics play a large role in performance evaluations. Plaintiff appealed to Mr. Platt about the impossibility of completing a closed project. Rather than simply removing the project from her assignment, Mr. Platt emailed Plaintiff and her entire team, ordering Plaintiff to complete an impossible task, writing, "Do as Samantha [Verhine] says." Mr. Platt's directive humiliated Plaintiff with her team.

59.     Subject Matter Expertise (SME) is a requirement for only the principal implementation job description. Other job descriptions do not include the SME requirement. On December 21, 2021, during a call with members of Plaintiff's team, Mr. Platt said, "Emily (Lindsey), you are a Subject Matter Expert, right?" Plaintiff replied, "In this situation, that would be Kirkland (Follis), as he was hired for that role." Mr. Platt responded that Plaintiff was being "voluntold" to be a Subject Matter Expert. None of Plaintiff's male colleagues on her team were tasked to perform as a Subject Matter Expert without being paid at the appropriate principal level.

60.     On December 22, 2021, Plaintiff sent an additional email to Mr. Tabourin about the assignment to her of the four hundred customer SymXchange Program. Once again, Mr. Tabourin ignored her email.

PAGE 16 – COMPLAINT AND DEMAND FOR JURY TRIAL

61.     On January 5, 2022, despite repeated communications to the senior leadership regarding overwork and numerous complaints about her workload and unfair pay situation, Plaintiff was assigned additional project manager duties as part of the JackHenry to jXchange Program.

62.     On January 11, 2022, Mr. Platt told Plaintiff that he had been secretly monitoring and recording her telephone conversations with her female colleagues without their consent. Plaintiff was surprised and replied, "These are private conversations. Why are you doing that?" Mr. Platt refused to tell Plaintiff why he was monitoring and recording her telephone conversations. Mr. Platt did not claim that the surveillance was due to any deficiency in Plaintiff's job performance. Mr. Platt explained that he did not like Plaintiff inquiring to her female colleagues about positions available in other departments, which is not against Defendant's policies. Mr. Platt said that Human Resources also monitored Plaintiff's telephone conversations with other employees and contractors, including support team members, sales employees, and project manager contractors. Mr. Platt was communicating a clear and coordinated attempt by Management and Human Resources to intimidate Plaintiff from communicating with her colleagues about the discrimination and the retaliation against her. Since learning that their telephone conversations with Plaintiff were monitored, several of her coworkers avoided speaking to Plaintiff at all.

63.     On January 11, 2022, Plaintiff emailed Mr. Tabourin a third time. Mr. Tabourin did not reply. Plaintiff forwarded the email she had sent to Mr. Tabourin to Mr. Platt. Plaintiff again informed Mr. Platt that she is not paid as a program manager, and it is inappropriate to task her with this level of program management without the proper pay and resources. Plaintiff

PAGE 17 – COMPLAINT AND DEMAND FOR JURY TRIAL

informed Mr. Platt that it is discriminatory that none of her male colleagues are tasked with unpaid labor far above their pay grade.

64.     On January 14, 2022, Plaintiff applied for an entry-level, tier one project management position on Christie McCutcheon's team. Plaintiff notified Mr. Platt that she had applied for the job. Plaintiff was promised an interview for the job.

65.     On January 25, 2022, Plaintiff contacted Mr. Platt as the posting for the tier one project manager had closed, and she had received a reply from the recruiter. Mr. Platt said that he would follow up with the recruiter.

66.     On January 27, 2022, Plaintiff received a call from Mr. Platt. Mr. Platt told Plaintiff that no one responded to her application because the position was "pre-filled." Plaintiff asked Mr. Platt what he meant by pre-filled. Mr. Platt said the position had been posted as an open position but only as a formality. Mr. Platt told Plaintiff he already had a specific individual in mind to fill the position before the position was posted. Mr. Platt laughingly suggested that Plaintiff continue to apply for project manager positions. However, Mr. Platt warned Plaintiff that if she successfully got a promotion and left Mr. Platt's team, he would see that her entire workload, including all projects and programs currently assigned to her, would carry over to any new role and that she would have to perform both her current job duties and the new job duties.

67.     On January 27, 2022, Plaintiff learned of another open senior project manager position on Ms. McCutcheon's team. Plaintiff notified Mr. Platt of the opening. Mr. Platt encouraged her to apply for the job, agreeing she was qualified for the position. Plaintiff submitted her application for the open position but did not receive a timely response from recruiting or Human Resources, and Ms. McCutcheon.

PAGE 18 – COMPLAINT AND DEMAND FOR JURY TRIAL

68.     On February 7, 2022, Plaintiff completed the first project as part of the JackHenry to jXchange migration Program, which Mr. Platt and Mr. Lemercier had assigned to her as a rush project. The project had a one-month due date. Plaintiff successfully delivered the project ahead of schedule despite the unreasonably and punishingly short notice.

69.     On February 17, 2022, Plaintiff learned that the February 7, 2022 project she had completed could not be "closed" because of a programming error made by another employee in a separate portion of the project.

70.     On February 29, 2022, during a telephone call, Mr. Platt asked Plaintiff if she was technically competent to take over and manage the large number of the program manager projects currently being managed by Ms. McCutcheon in addition to her "normal workload."

71.     On April 7, 2022, during a "one-on-one" telephone call with Mr. Platt, Mr. Platt said that the second project manager position Plaintiff applied for on January 27, 2022, although posted as open internally, was also a "special posting" intended for a pre-determined person and that Plaintiff had no chance at the job.

72.     On April 18, 2022, Mr. Platt emailed Plaintiff to task her with creating a complete customer list for the jXchange and SymXchange migration programs, a program manager responsibility. The assignment involved a substantial amount of added work, and because no credit was given to Plaintiff for this assignment, performing the additional duties would result in lower productivity on Plaintiff's job metrics. None of Plaintiff's male colleagues were tasked with completing these program manager responsibilities. Plaintiff responded that Defendant already had a customer database for these programs and that responsibility for all aspects of these programs lay with Ms. McCutcheon's team. Mr. Platt said he knew that, but wanted her to do the task anyway.

PAGE 19 – COMPLAINT AND DEMAND FOR JURY TRIAL

73.     On May 2, 2022, Mr. Platt informed Plaintiff that he was assigning her to take on additional project manager and program manager duties based "on the business need," despite Plaintiff's continued reports that she has not been promoted or paid as a project or program manager because of gender-based discrimination. To Plaintiff's best knowledge, none of her male colleagues on her team were assigned unpaid labor at the program and project manager level.

74.     On May 2, 2022, Plaintiff attended a call hosted by Mr. Lemercier, reviewing the progress of an ongoing and complex program. Mr. Lemercier asked about a project that Plaintiff had recently completed. Plaintiff explained that while she had completed her work, the required communication with a third-party software developer and vendor was poor. Mr. Lemercier said that a new computer process for the program was ready and directed Plaintiff to test the new software extension process for compatibility with the other vendor's system and apply it, which was the program manager's duty. Plaintiff contacted the third-party software developer for specific information about the new code. The male software developer asked to be put in contact with the actual "Project Manager," saying that Plaintiff was just an "installer."

75.     On May 4, 2022, Plaintiff tested, configured, and applied the new software extension assigned to her by Mr. Lemercier on May 2, 2022. During an instant message-based conversation with Mr. Platt about the project, Plaintiff reiterated that the significant delays in the short time frames and complex programs were based on the lack of the title of project manager or program manager. The industry standard is for vendors, developers, and technicians to be accountable to project managers, not other technicians and administrative staff. Therefore, Mr. Tabourin and the developers were accustomed to responding to project managers and the overall program manager. Without such a title, Plaintiff's requests and direction were often ignored and

PAGE 20 – COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff was being held responsible for work she could not complete. Despite this, the project went flawlessly. However, the delays, caused not by Plaintiff but by her lack of an authority-granting title, did impact the metrics used in her job performance evaluation.

76.     On May 4, 2022, Ms. Verhine, newly promoted to supervisor of implementation, told Plaintiff that, per Mr. Platt, Plaintiff was to train David MacMillan, a male recently hired as a permanent employee, as Plaintiff's "replacement" while performing the rest of her job duties.

77.     "Go-live" is a critical event in the industry, during which a financial institution activates its suite of computer systems to issue live debit and credit cards. These events are generally attended by all the relevant vendors and stakeholders in the project because this is the point where the system either works or does not work. A failure that cannot be quickly remedied will almost certainly cause a monetary loss to the client due to the staffing requirements and a resultant escalation of the project to senior leadership. Even if Defendant was not actively taking part during a particular portion of the go-live process, due to the complex interrelation of these diverse computer systems, an asset of Defendant must be available to prevent failure that could be attributed to the company.

78.     In advance, Plaintiff noted the entire day of May 9, 2022, as unavailable for a "go live." Although Mr. Lemercier and Mr. Platt had access to Plaintiff's calendar, they required Plaintiff to attend a call regarding the jXchange migrations program, a program Plaintiff was told would be handled by another department. During the May 9, 2022, call, Mr. Lemercier and Mr. Platt told Plaintiff that she would now be responsible for handling migration projects and her regular duties. Mr. Lemercier and Mr. Platt assigned Plaintiff the responsibility and work assigned to a senior project manager in another department while not crediting Plaintiff for her work. Plaintiff was to perform the additional project manager work without assistance or

PAGE 21 – COMPLAINT AND DEMAND FOR JURY TRIAL

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

additional resources. Plaintiff asked who would serve as the program manager for these programs. Mr. Platt and Mr. Lemercier refused to answer. None of Plaintiff's male colleagues, all with less crowded schedules and far fewer assigned responsibilities, were given any of this responsibility. Plaintiff was once again being singled out for more work and less pay based on gender and being retaliated against for speaking out.

79.     On May 9, 2022, following the call with Mr. Platt and Mr. Lemercier, James Ellis, a sales employee in Defendant's Marketing Department, emailed Mr. Lemercier, Mr. Platt, Mr. Tabourin, and Plaintiff, writing that he had 622 upcoming migrations projects ongoing or about to begin. Of those 622 projects, 127 were assigned to Ms. McCutcheon's team, the Vantiv to FIS New Berlin migration programs. Plaintiff was assigned the two largest migrations, with 128 and 267 customers.

80.     On May 10, 2022, Plaintiff was assigned to perform the Vantiv to FIS New Berlin migration programs assigned to Ms. McCutcheon. Not a single project was assigned to a male colleague.

81.     On May 10, 2022, based on communications with vendors, Mr. Ellis added even more projects to the massive Vantiv to FIS New Berlin migration programs.

82.     On May 19, 2022, Plaintiff received a yearly review from Mr. Platt. Although she had earned both a Project Manager Professional (PMP) certification and a master's degree while handling far more responsibilities than any male colleagues, Mr. Platt rated Plaintiff "Achieves" expectations rather than the "Exceeds" expectations rating she received in 2021 before Mr. Platt was hired by Defendant. Mr. Platt told Plaintiff that the team has no one to do what she does and that Mr. Platt has no metrics for measuring Plaintiff's performance. Mr. Platt had insisted that Plaintiff train her replacement. Plaintiff was also required to train the male employees on her

PAGE 22 – COMPLAINT AND DEMAND FOR JURY TRIAL

team to perform at her level. Plaintiff asked, if she was rated as performing at an "average" level, then what ratings were given to her similarly situated male coworkers who do not perform half so well as she did? Mr. Platt did not respond to Plaintiff.

83.    On May 23, 2022, Mr. Platt contacted Plaintiff through a Teams instant message chat. Mr. Platt wrote, "Good morning!!!! High-level SWAG." Plaintiff regarded Mr. Platt's labeling of her as "Stuff We All Get" (SWAG) as misogynistic. When Plaintiff objected to being referred to as SWAG, Mr. Platt became hostile.

84.    On May 23, 2022, within two hours of Mr. Platt referring to Plaintiff as SWAG, Mr. Platt contacted Plaintiff via Teams chat to reprimand Plaintiff for not managing the technical record keeping of Jesus Hernandez, a male colleague who was not on Plaintiff's team but was assigned to a team supervised by a male, Shane Blea. Through a non-competitive process, Mr. Lemercier had put Mr. Blea into the supervisor role that Plaintiff applied for.

85.    On May 23, 2022, Plaintiff contacted Mr. Hernandez per Mr. Platt's directive. Mr. Hernandez told Plaintiff that in the year he was employed as a contractor with Defendant, he had never had a one-on-one meeting either physically or via phone with his supervisor, Mr. Blea. Mr. Hernandez stated his frustration at wanting to do well but being untrained for the role. Mr. Hernandez did not realize the requirement to complete the technical record.

86.    On May 25, 2022, Mr. Platt contacted Plaintiff via Teams instant message chat. Mr. Platt reprimanded Plaintiff for not contacting a customer, Security Credit Union, within one week of being assigned a project. Mr. Platt's reprimand was unreasonable since Defendant's documented policy or procedure and statement of work, signed by that customer, confirmed a twelve-week window to initiate customer contact. A one-week deadline is unreasonable and violates policy. No male colleague was held to this standard. During the telephone call, Mr. Platt

PAGE 23 – COMPLAINT AND DEMAND FOR JURY TRIAL

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

further harassed and threatened Plaintiff's employment by sending Plaintiff a meeting request for June 1, 2022, to discuss training her replacement, David MacMillan.

87.    Mr. Platt used female employees to appease male clients. On May 25, 2022, Mr. Platt emailed Plaintiff to direct Plaintiff to contact a client immediately. Plaintiff asked why she was being rushed on this assignment rather than it being assigned to less busy team members, all of whom were male. Mr. Platt told Plaintiff that he had to put someone "presentable" in front of the male client. Plaintiff then received another email from Mr. Platt in which Mr. Platt stated that he needed Plaintiff to act as a Project Manager on this matter because Mr. Platt needed a "presentable" project manager to put in front of a male customer. Mr. Platt went to Ms. Verhine, another female employee who works for Mr. Platt.

88.    Regarding the project manager position Plaintiff applied for on January 27, 2022, Ms. McCutcheon was silent for four months. On May 25, 2022, Ms. McCutcheon reached out to schedule Plaintiff's interview for that position. By then, Mr. Platt had already told Plaintiff that she had no hope of getting the role. Mr. Platt had also long been assigning Plaintiff the work of Ms. McCutcheon's entire department. Ms. McCutcheon could not meet with Plaintiff until June 21, 2022.

89.    Defendant's procedure is that the project manager should provide the customers with final surveys. The survey process allows client comments and suggestions to be captured, documented, and recorded. On May 26, 2022, two customers emailed Plaintiff asking Defendant to provide a survey so that Plaintiff might be given high marks for the overall project's success. Plaintiff forwarded the customer's email to Mr. Platt and Mr. Lemercier. Mr. Platt ignored the customer's request. Mr. Lemercier responded with, "That is good – thanks." No survey was provided to the customers.

PAGE 24 – COMPLAINT AND DEMAND FOR JURY TRIAL

90.     On May 26, 2022, Supervisor Shane Blea invited Plaintiff to a meeting concerning conversion migration projects. The other participants included Debra Vera, a contractor project manager assigned to manage migration projects; Mr. Platt; and Ms. McCutcheon, project manager team manager. This invitation, exclusive to project managers, demonstrates that Plaintiff was being tasked and utilized as a project manager and program manager while being denied a promotion to the role.

91.     On June 1, 2022, Ms. Vera, a female project manager contractor on Ms. McCutcheon's team, emailed Plaintiff, notifying Plaintiff that Ms. Vera, had been let go and would no longer manage the Vantiv to PaymentsOne migration programs she had been assigned. Ms. Vera's project management caseload was transferred to Plaintiff, increasing the amount of project and program management work for which she was accountable but not paid for.

92.     On June 1, 2022, Mr. Platt sent Plaintiff a recurring Outlook calendar invite titled: "Conversion Discussions calendar invite to Discuss the programs in the process." The invite also clearly referenced Plaintiff being required to train David MacMillan, her replacement, as one of her job duties. Plaintiff cleared her scheduled work for this call. Mr. Platt then canceled the call without comment. Mr. Platt was aware that Plaintiff has an anxiety disorder.

93.     Defendant did not issue Plaintiff a mobile telephone. Plaintiff was required to use her mobile telephone for work and seek reimbursement for the monthly bill by claiming the charge on an expense account. Defendant did not pay for Plaintiff's mobile telephone. On June 8, 2022, Mr. Platt refused to authorize Plaintiff's expense account for her mobile and questioned why she needed to use a mobile telephone for her company work. None of her male coworkers reported having been denied their cell phone reimbursement. It was embarrassing and condescending to be publicly denied such a fundamental technology; one that was provided to

PAGE 25 – COMPLAINT AND DEMAND FOR JURY TRIAL

her male colleagues. As of May 23, 2024, she could not do multi-factor verification because Plaintiff did not have a company-issued mobile telephone and was unable to access vital work resources.

94.    On June 8, 2022, Mr. Platt told Plaintiff she could not be promoted until she trained her male replacement.

95.    On June 8, 2022, Mr. Platt criticized Plaintiff for not having an earlier interview for the open senior program manager position.

96.    On June 20, 2022, Entrust fired a female employee, Karen Vogel. Mr. Platt put Ms. Vogel on a six-week Performance Improvement Plan (PIP). Ms. Vogel said that after being placed on the plan, Mr. Platt refused to assign her any work, preventing Ms. Vogel from showing even marginal improvement to meet the expectations of the PIP.

97.    On June 21, 2022, Ms. McCutcheon failed to attend the interview scheduled with Plaintiff for the senior project manager position despite numerous automatic reminders that the interview was scheduled, due, and overdue for Ms. McCutcheon's attendance. On June 22, 2022, Mr. Platt responded to Plaintiff's June 21, 2022, email about Ms. McCutcheon not attending the interview with her for the senior project manager position. Mr. Platt stated, "She has told me she will be reaching out to you today."

98.    In July of 2022, Defendant posted a senior project manager position with the Central Issuance Department. On November 28, 2022, Plaintiff applied for this position.

99.    On June 24, 2022, Mr. Platt set training her replacement as Plaintiff's yearly performance goal.

100.    On June 30, 2022, Mr. Platt emailed Plaintiff, copying Ms. Verhine. Mr. Platt wrote that they had gone through Plaintiff's projects and cherry-picked two for Ms. Verhine to

PAGE 26 – COMPLAINT AND DEMAND FOR JURY TRIAL

take without consulting Plaintiff. Plaintiff had already engaged in both these projects and begun working with them and now would receive no credit for that work. The projects were then assigned to Jared Burkeybile. Mr. Burkeybile contacted Plaintiff for assistance in completing the work because he said the projects were complicated.

101.    As of July 12, 2022, Plaintiff continued to succeed at her job. On July 12, 2022, Plaintiff wrote a development installation document, published it within the organization, and assisted several installers with it. Her speedy completion of the project is something that no other implementation team member had ever accomplished, providing incredible value to the entire organization.

102.    On July 12, 2022, Mr. Platt contacted Plaintiff via instant message Teams chat about a task the Alliances Marketing team assigned to Mr. Platt and Ms. McCutcheon for their meeting with the vendor, VisaDPS. Mr. Platt reassigned Plaintiff his work for this request, so Plaintiff's scheduled work had to be set aside. Plaintiff received no credit, award, title, or payment to account for her completing Mr. Platt's work.

103.    On July 28, 2022, Plaintiff's company-issued computer began to fail. The keyboard became inoperable. In response to Plaintiff's request for permission to purchase an external keyboard, Mr. Platt lectured Plaintiff about the reasonableness of the purchase.

104.    On August 4, 2022, Mr. Platt emailed the customer, Primis Bank, stating that Plaintiff was assigned their project and "Emily is one of my Senior Implementation Resources who is also an experience (sic) PM (Project Manager). I think this will be a great match." Mr. Platt told the customers that Plaintiff was a program manager and would function as such for their project.

PAGE 27 – COMPLAINT AND DEMAND FOR JURY TRIAL

105.    On August 4, 2022, Plaintiff's laptop failed. Plaintiff initiated an instant message Teams Chat with her direct supervisor, Mr. Platt, informing him of this and the need to reschedule her work. The equipment failure significantly affected Plaintiff's productivity, Mr. Platt's departmental operations, and customer service. Mr. Platt could have avoided those failures if he had heeded Plaintiff's concerns that her laptop was failing; her primary tool for work. Instead, Mr. Platt met Plaintiff's concerns with patronization and obstruction. As far as Plaintiff knows, none of her male colleagues were forced to work on failing equipment until it failed.

106.    On August 5, 2022, during a Teams chat with Mr. Platt regarding the Primis Bank conversion, Mr. Platt admonished Plaintiff for contacting the Entrust Sales department without contacting Mr. Platt first. Plaintiff explained that it was evident from the correspondence that Sales had reached out to Plaintiff, as they frequently do, and not vice versa. Mr. Platt ignored the objective reality of the situation and was openly hostile to the facts being presented.

107.    On August 9, 2022, during a Teams Chat, Mr. Platt scolded Plaintiff for putting the Primis Bank conversion project involving Mr. Platt's former employee into "order incomplete" status. Plaintiff explained to Mr. Platt that the project could not proceed until a technical process called scripting was ordered and uploaded. Mr. Platt argued against the need for scripting.

108.    Plaintiff was ordered to treat training David MacMillan as a priority. Plaintiff had scheduled an August 18, 2022, engagement with a VisaDPS conversion customer. As part of his training, Mr. MacMillan would attend this meeting. However, Mr. MacMillan was scheduled for another task at this time. Plaintiff rescheduled the meeting for August 23, 2022. Mr. MacMillan declined the rescheduled meeting at the last minute, claiming to be busy. Mr. MacMillan's lack of availability impacted Plaintiff's ability to train him, which impacted Plaintiff's annual review.

PAGE 28 – COMPLAINT AND DEMAND FOR JURY TRIAL

109.    On September 23, 2022, Entrust promoted a male employee to principal implementation specialist and subject matter expert without informing Plaintiff about the opening.

110.    October 11, 2022, Plaintiff received a mid-year performance review from Mr. Platt. Mr. Platt stated that Plaintiff's projects had been moved to Ms. McCutcheon's team and that Plaintiff would not be assigned any further projects. Mr. Platt also told Plaintiff she was being moved to Mr. Blea's team as a regular senior technician, not a project manager. Mr. Platt said he was aware that project management was Plaintiff's passion but that Plaintiff would not be promoted until other male employees were trained to perform Plaintiff's job at Plaintiff's level of expertise.

111.    On October 11, 2022, Plaintiff was informed by Jared Burkeybile that a specialized computer training program, MultOs, which Plaintiff had been repeatedly requesting during the past seven years, was being held that day. Mr. Blea, Ms. Verhine, and Mr. Platt notified every male team member about the training and invited them to attend. Even the male senior implementation specialist working in the Shakopee, Minnesota office, Enoch Nyakondo, was flown into the Denver, Colorado office to participate. No one told Plaintiff about the training; she was not invited to attend and did not learn of the event until the training started.

112.    On November 15, 2022, Defendant replaced Plaintiff's laptop. The loading software caused her to miss some chat messages.

113.    On November 16, 2022, Defendant's Helpdesk helped address Plaintiff's issue with her new laptop. Once that issue was resolved, Plaintiff was required to configure the computer with various external hardware and install a Microsoft Windows update. Helpdesk resources installed several other required software packages. While Plaintiff was working on this

PAGE 29 – COMPLAINT AND DEMAND FOR JURY TRIAL

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

and unable to receive any instant messages via Teams chat, Debbie Bruning, a new senior project manager hired by Mr. Platt for Ms. McCutcheon's team, reached out via instant message Teams chat to ask Plaintiff if Plaintiff had availability to help Ms. Bruning with a task. Because Plaintiff was running Windows updates and her secure connection had dropped during the installation, she could not see Ms. Bruning's chat messages. Plaintiff was, however, using Outlook web email and attending her appointments for the day.

114. On November 16, 2022, precisely one hour after Ms. Bruning reached out to Plaintiff, Ms. Bruning reported to Mr. Platt that Plaintiff was not responding. Mr. Platt also sent Plaintiff a chat in Teams, but no email, saying that Ms. Bruning needed to speak with Plaintiff. Plaintiff only had email availability during this time. She had kept up with email but had not been able to receive instant message correspondence.

115. On November 17, 2022, Plaintiff's new laptop updates were still being applied. Plaintiff had no audio as her headset application installation had not yet been completed. Plaintiff's secure connection was also updating, preventing her from signing into Defendant's network resources. Plaintiff could not reboot her laptop until the updates had been completed. Plaintiff was still completely unaware of the several attempts to reach her exclusively via Teams chat. Plaintiff's computer was in "Do Not Disturb" status the entire day so that people seeking to contact her would understand that she was unavailable and unable to receive instant message communications. Ms. Bruning reached out via instant message Teams chat at 10:15 a.m. Pacific Time, asking if Plaintiff was available after noon Pacific Time to assist in completing Ms. Bruning's project management work.

116. On November 17, 2022, at 12:40 p.m. Pacific Time, Mr. Platt sent an instant message Teams chat, not an email, to Plaintiff and her new supervisor, Mr. Blea, writing, "Shane

PAGE 30 – COMPLAINT AND DEMAND FOR JURY TRIAL

Blea, Please put a call on Emily's calendar to find out why she is reading my messages, Debbie's messages and then ignoring us This is a performance and lack of teamwork issue that we need to correct."

117.    Plaintiff messaged Mr. Blea, letting Mr. Blea know that she had been busy working on her new laptop and that no emails were sent to Plaintiff. The communications had all been via instant message Teams chat, and Plaintiff could not receive Team chats when in "Do Not Disturb" status.

118.    On December 6, 2022, Plaintiff engaged in whistleblowing by reporting wage and hour violations to Ms. Mattia in Human Resources. On November 22, 2022, supervisors Ms. Verhine and Mr. Blea hosted a call with the senior implementation specialist team regarding after-hours support coverage. Ms. Verhine and Mr. Blea attempted to implement an on-call rotation scheme proposed by Mr. Platt. The on-call rotation scheme was for salaried senior implementation specialists to perform after-hours, weekend, and holiday on-call work. During the call, Ms. Verhine and Mr. Blea said this plan was to avoid paying the hourly, non-senior technicians overtime wages. In addition, salaried senior implementation specialists were told that they would now be expected to work after-hours, beyond the regular business hours of Defendant, exceeding 40 hours per week, without additional compensation for time worked or the guarantee of equal flex time being given to compensate them.

119.    On December 6, 2022, there was a follow-up discussion call with the seniors, principals, and supervisors about the new on-call rotation. The plan was to have employees schedule themselves for off-duty, on-call shifts, including weekends and holidays. Although they would be required to respond to calls for service within an hour, the employees would not be compensated for this time. If they answered a call, they might be given flex time to use in the

PAGE 31 – COMPLAINT AND DEMAND FOR JURY TRIAL

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

week, and they would be given Amazon gift cards through the Entrust Awards Plan. When asked by several employees about the consequences of not scheduling themselves for the new forced on-call rotation, Mr. Blea said that senior implementation technicians were "spoiled" for objecting to the scheme. Charles Young and Plaintiff suggested putting the program on hold so that Defendant's legal department could comment. Ms. Verhine became combative and used profanity, and the call ended without the team's agreement to comply with this scheme.

120.    On December 6, 2022, Plaintiff engaged in whistleblowing over management's scheme to require employees to work on call on weekends without compensation. Plaintiff notified Ms. Mattia in Human Resources regarding the plan to require employees to work for gift cards and the use of the employment evaluation process to compel compliance with the pay scheme. During the meeting, Plaintiff also raised concerns about the supervisors' offensive behavior. Neither Ms. Mattia nor anyone else in Human Resources contacted Plaintiff with a resolution to the situation.

121.    At the end of November 2022, Plaintiff applied for a senior project management position on another team at Defendant, under different management. Per Defendant's policy, Plaintiff emailed her supervisor, Mr. Platt, and Ms. Mattia in Human Resources. Mr. Platt had repeatedly stated that Plaintiff would not be promoted unless all male employees were trained to Plaintiff's level of knowledge. Plaintiff then emailed Ian Astbury, the Director of the Central Issuance team, a complete, detailed resume and information indicating her ideal candidacy for the position.

122.    On December 6, 2022, Plaintiff interviewed for the senior project manager position with the Central Issuance Department Director, Ian Astbury. Mr. Astbury conducted a

PAGE 32 – COMPLAINT AND DEMAND FOR JURY TRIAL

pro forma interview that lacked detailed questions. During the interview, Mr. Astbury asked Plaintiff how her department could handle her leaving.

123.    On December 22, 2022, Mr. Astbury emailed Plaintiff: "Hi Emily- just dropping you a note to let you know that we are going through the process of screening candidates for the Sr. Project Manager position and in early January, we'll let you know if you qualify for the second round of interviews. Thank you for your patience and understanding." At that point, Plaintiff had been performing project and program Manager for Entrust for seven years and project manager duties in other fields for over twenty years. Plaintiff never heard back from Mr. Astbury or Human Resources regarding her application for the senior project manager position on the Central Issuance Team.

124.    On January 13, 2023, Plaintiff made a report to Ms. Mattia in Human Resources about the toxic work environment that was perpetuated by Mr. Platt and the continued discriminatory behavior within Mr. Platt's department, enabling a male colleague to be comfortable plagiarizing her work and giving her no credit.

125.    On March 14, 2023, Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries Civil Rights Division (BOLI CRD) (EEEMSX230314-60297), alleging gender discrimination and whistleblower retaliation. BOLI CRD co-filed the complaint with the EEOC.

126.    On June 28, 2023, Plaintiff filed a supplemental BOLI CRD complaint. Plaintiff detailed acts of retaliation by Mr. Platt, Mr. Blea, and other supervisors:

   a. Brian Platt scheduled meetings with Plaintiff and then canceled them at the last minute;

   b. Supervisors demeaned Plaintiff and her work in front of others;

   c. Supervisors removed job duties from Plaintiff that impacted her ability to be promoted to a project manager and impacted how she was viewed in the industry;

PAGE 33 – COMPLAINT AND DEMAND FOR JURY TRIAL

d. Shane Blea no longer allowed Plaintiff to flex her after-hours work. Male colleagues are allowed to flex their hours.

e. Entrust used its investigatory process to retaliate against Plaintiff.

127. Plaintiff continued to experience discrimination and was subjected to different treatment than her male colleagues. None of her male colleagues were assigned to train others, nor was their performance tied to the training's success. She was continually assigned project manager and program manager-level work without being compensated for performing at that level of work. None of her male colleagues were tasked to perform this level of work. Plaintiff was tasked with supporting and assisting male colleagues in completing their work, but she was not given credit for it. Male employees were praised by supervisors for the work that Plaintiff completed.

128. On April 14, 2023, Plaintiff made a request for disability accommodations to Chrissy Dajc, Director of Human Resources. The accommodations Plaintiff requested were for Defendant to instruct their management team to act in compliance with Defendant's policies and the relevant law, stopping the daily harassment and retaliation that was inflaming Plaintiff's anxiety disorder to the point that she was having panic attacks. Ms. Dajc denied the request. Ms. Dajc's only recommendation was that Plaintiff apply for disability leave through the short-term and long-term disability insurance policies that Plaintiff purchased through Defendant. Plaintiff told Ms. Dajc that Plaintiff did not want to go on disability leave, which would have also impacted Plaintiff's personnel record and made her ineligible for promotion consideration.

129. On April 17, 2023, in response to Plaintiff's January 13, 2023, notification to Ms. Mattia in Human Resources of a hostile work environment, Kelsey Holthus, Vice President of Human Resources, placed Plaintiff on paid administrative leave pending a Human Resources

PAGE 34 – COMPLAINT AND DEMAND FOR JURY TRIAL

investigation. Plaintiff was on administrative leave from April 17, 2023, to May 2, 2023, with pay. Ms. Dajc took over the investigation. Human Resources did not stop the ongoing discrimination, harassment, and retaliation that Plaintiff faced daily working for Defendant. By not stopping the harassment or harassers but removing Plaintiff from the environment, Defendant explicitly violates its written harassment and discrimination policies. This unnecessary leave removed Plaintiff from her usual work for two weeks while Human Resources allegedly conducted an investigation. Every hour of leave reduced the metrics used to determine Plaintiff's advancement and compensation at Defendant. At the conclusion of the investigation, Defendant claimed that none of their company policies were violated and dismissed Plaintiff's complaints, which damaged her reputation with colleagues, vendors, and customers.

130.    On May 2, 2023, Human Resources required Plaintiff to renew and re-sign her remote Flexible Work Arrangement and issued her a copy of the policy. This policy prohibits Plaintiff from traveling on business without explicit prior authorization.

131.    On May 11, 2023, Mr. Blea, Plaintiff's direct supervisor at the time, forced Plaintiff to input the training of male employees as her personal goal for her yearly review. Mr. Blea did not provide Plaintiff with any goals to meet which would further Plaintiff's career.

132.    On July 19, 2023, Plaintiff applied for promotion to principal implementation specialist. On August 23, 2023, Defendant formally denied Plaintiff the principal implementation specialist position and awarded it to Mr. Blea, an employee Plaintiff had been required to mentor.

133.    In September 2023, Mr. Platt posted Mr. Blea's now vacant supervisor position as Mr. Blea had been promoted to principal implementation specialist. Mr. Platt's posting for supervisor was region-specific to Defendant's Minnesota office, while the previous supervisor

PAGE 35 – COMPLAINT AND DEMAND FOR JURY TRIAL

position had not been region-specific. The posting of the position as a hybrid work position in Minnesota was precisely to prevent Plaintiff from applying for the position. The other supervisor position on Mr. Platt's team was held by Ms. Verhine, a fully remote employee in Alabama, where Entrust does not have an office.

134.    On September 12, 2023, Mr. Platt removed Plaintiff from several projects in retaliation for speaking out against the discriminatory conduct of Heidi Kaine, Brian Platt, and Shane Blea. Removing Plaintiff from projects undermined her relationships with customers, vendors, and colleagues. Removing Plaintiff from the project assigned damaged Plaintiff's credibility and reputation with her colleagues employed by Defendant within the Financial Tech industry as a whole.

135.    On November 16, 2023, Kasey Steckler, Entrust Human Resources Manager, discussed with Plaintiff both her disability and ADA accommodation requests. Ms. Steckler proposed accommodating Plaintiff by reducing Plaintiff's pay and work by 60%.

136.    On December 6, 2023, Enoch Nyakondo, a male senior implementation technician with several years less experience than Plaintiff, was promoted to the supervisor position vacated by Mr. Blea. Mr. Nyakondo had previously approached Plaintiff frequently for technical assistance with his own project work.

137.    On December 15, 2023, Plaintiff was emailed a "to-do" task to complete her yearly goals within the WorkDay system. For Plaintiff to complete her yearly goals within the WorkDay system, she had to be assigned goals by a supervisor. Plaintiff could not complete her year goals because a supervisor had not assigned her goals. The failure by Defendant to set goals for Plaintiff directly impacted her performance review, yearly earnings, bonus payout, and merit raise increases.

PAGE 36 – COMPLAINT AND DEMAND FOR JURY TRIAL

138. On January 9, 2024, Defendant lowered Plaintiff's production metrics, which affected her performance evaluation, bonus money, and chances at advancement. The lowering of production metrics also hurt her professional reputation.

139. On February 7, 2024, Plaintiff, through counsel, filed a third administrative complaint against Defendant with BOLI CRD. Said complaint was co-filed with the EEOC.

140. On February 9, 2024, Plaintiff applied for a position posted for a remote "field" supervisor position. On February 27, 2024, Plaintiff was interviewed for the position by Ms. Bristow and Mr. Platt. During the interview, Plaintiff told Ms. Bristow and Mr. Platt that she had already taken the Entrust Leadership Academy virtual courses and was only awaiting the next formal in-class session to be offered by Defendant. Mr. Platt told Plaintiff that as a requirement for promotion, Plaintiff was required to perform "more formal mentoring of other team members," as if she had not already done so. Mr. Platt had repeatedly stated to Plaintiff that Plaintiff must train all the men in the department to her own knowledge and ability levels before she can be considered for a promotion.

141. On April 10, 2024, Plaintiff received notification from Senior Implementation Manager Mr. Platt of her denial of the position of supervisor. Platt wrote:

> "Emily, Thank you for applying for the Supervisor of Implementation position. I am writing to inform you that another candidate has been selected for the role. I was impressed with the strengths you displayed in customer focus and high quality during the interview. If your career goals include moving into a leadership position in the future, *some development opportunities would be the Entrust Leadership Academy and more formal mentoring of other team members.* Please let me know if you want to connect more about how we can support your career development in these or other ways. You can also reach out to Cara, our HRBP, copied here if you have any questions."

142. Defendant exercised gender bias and discrimination when it chose a male, Michael Schoenbauer, for the supervisor position. Mr. Schoenbauer had far less experience than

PAGE 37 – COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff and did not have to meet the requirements that Defendant imposed on Plaintiff. At the time Defendant chose Mr. Schoenbauer for the supervisor position, he was not an employee of Defendant but had been working as a contractor. Completing the Leadership Academy and mentoring all males on a team was not a requirement for Mr. Schoenbauer, but it was a requirement for Plaintiff, the female on the team seeking advancement.

143.    Mr. Schoenbauer was new to the team and would be incapable of mentoring fellow team members. Furthermore, Leadership Academy in-class coursework that Defendant insisted Plaintiff take as a prerequisite for promotion could not have been completed by Mr. Schoenbauer since it had not been offered before he was selected.

144.    On May 1, 2024, Ms. Dajc sent Plaintiff a letter claiming that all of her complaints of discrimination were groundless.

## FIRST CLAIM FOR RELIEF

(Title VII Civil Rights Act of 1964)

(Gender and Sex Discrimination – 42 USC §2000e-2)

145.    Plaintiff alleges all prior relevant paragraphs as if fully set forth herein.

146.    At all material times, Defendant was an employer within the meaning of 42 USC § 2000e (b).

147.    Defendant discriminated against Plaintiff with respect to the terms and conditions of her employment, including compensation, because of Plaintiff's gender and sex as alleged above.

148.    As a result of Defendant's unlawful employment actions, Plaintiff suffered and continues to suffer economic and noneconomic damages in an amount to be proved at trial.

PAGE 38 – COMPLAINT AND DEMAND FOR JURY TRIAL

149.    Plaintiff is entitled to an award for past lost wages and benefits, future lost earnings, benefits, and lost earning capacity, and other compensatory damages for future pecuniary losses. Plaintiff's economic damages are continuing in nature and are not presently known.

150.    Plaintiff is entitled to an award for noneconomic damages for her emotional distress.

151.    To the extent any amount awarded to Plaintiff is for damages occurring prior to the entry of judgment, Plaintiff is entitled to an award of pre-judgment interest at the legal rate from the date the damage occurred until the date of judgment.

152.    Plaintiff is entitled to post-judgment interest on all damages, costs, and attorneys' fees from the date of judgment until the date paid.

153.    Pursuant to 42 USC § 2000e-5, Plaintiff is entitled to an award of attorneys' fees, expert witness fees, and costs incurred herein.

154.    Plaintiff also seeks an award for such additional relief as justice may require.

## SECOND CLAIM FOR RELIEF

### (Gender Retaliation - 42 USC § 2000e-3)

155.    Plaintiff realleges all prior relevant paragraphs as if fully set forth herein.

156.    At all material times, Defendant was an employer within the meaning of 42 USC § 2000e (b).

157.    Defendant discriminated and retaliated against Plaintiff with respect to the terms and conditions of her employment because Plaintiff opposed unlawful gender and sex discrimination.

PAGE 39 – COMPLAINT AND DEMAND FOR JURY TRIAL

158.    As a result of Defendant's unlawful employment actions, Plaintiff suffered and continues to suffer economic and noneconomic damages in an amount to be proved at trial.

159.    Plaintiff is entitled to equitable relief, including, but not limited to, an award of back pay and lost benefits. Plaintiff should be awarded past economic damages in an amount determined fair by a jury to compensate Plaintiff for lost employment opportunities, including, but not limited to, promotions and raises. Plaintiff's economic damages are continuing in nature and are not presently known.

160.    Plaintiff is entitled to noneconomic damages for her emotional distress.

161.    To the extent any amount awarded to Plaintiff is for damages occurring prior to the entry of judgment, Plaintiff is entitled to an award of pre-judgment interest at the legal rate from the date the damage occurred until the date of judgment.

162.    Plaintiff is entitled to post-judgment interest on all damages, costs, and attorneys' fees from the date of judgment until the date paid.

163.    Pursuant to 42 USC § 2000e-5, Plaintiff is entitled to an award of attorneys' fees, expert witness fees, and costs incurred herein.

164.    Plaintiff also seeks an award for such additional relief as justice may require.

## THIRD CLAIM FOR RELIEF

(Title I of the Americans with Disabilities Act – Discrimination)

165.    Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

166.    At all times material, Defendant was an employer for the purpose of, and subject to, the Americans with Disabilities Act (ADA).

PAGE 40 – COMPLAINT AND DEMAND FOR JURY TRIAL

167.    Plaintiff has an impairment which substantially limits one or more major life activities, has a history and/or record of such impairment, and/or was regarded by Defendant as having such impairment.

168.    After Plaintiff disclosed her disabilities to Defendant, Defendant began to discriminate against Plaintiff as alleged above. Said discrimination was based on Defendant's failure to reasonably accommodate Plaintiff, disparate treatment, and retaliation.

169.    Defendant failed to engage in the interactive process with Plaintiff.

170.    Plaintiff requested reasonable accommodations from Defendant.

171.    At all relevant times, Plaintiff was able to perform the essential functions of Plaintiff's position, with or without reasonable accommodation.

172.    Defendant's conduct violated 42 U.S.C. § 12112.

173.    As a result, Plaintiff suffered damages and is entitled to these damages and other relief set forth below.

174.    Plaintiff is entitled to equitable relief, including, but not limited to, a declaration that Defendant violated Plaintiff's statutory rights, reinstatement, and an injunction prohibiting further discrimination and retaliation.

175.    Plaintiff is entitled to an award for past lost wages and benefits and future lost earnings, benefits, and lost earning capacity, and other compensatory damages for past and future pecuniary losses. Plaintiff should be awarded economic damages in an amount determined fair by a jury.

176.    Plaintiff is entitled to noneconomic damages sufficient to compensate Plaintiff for emotional distress and other nonpecuniary losses in an amount to be proved at trial. Plaintiff should be awarded noneconomic damages in an amount determined fair by a jury.

PAGE 41 – COMPLAINT AND DEMAND FOR JURY TRIAL

177.    The court should enter an order declaring that Defendant violated the ADA.

178.    To the extent any amount awarded to Plaintiff is for damages occurring prior to the entry of judgment, Plaintiff is entitled to an award of pre-judgment interest at the legal rate from the date the damage occurred until the date of judgment.

179.    Pursuant to 42 U.S.C. § 12205, Plaintiff is entitled to an award of attorneys' fees, expert witness fees, and costs incurred herein.

180.    Plaintiff is entitled to post-judgment interest on all damages, costs, expenses, and fees from the date of judgment until the date paid.

## FOURTH CLAIM FOR RELIEF

(ORS 659A.103 et seq. – Oregon Disability Discrimination)

181.    Plaintiff re-alleges all relevant paragraphs.

182.    Plaintiff is a 'disabled person' as defined at ORS 659A.104(1).

183.    Defendant is an 'employer' as defined at ORS 659A.106.

184.    After Plaintiff disclosed Plaintiff's disabilities to Defendant, Defendant began to discriminate against Plaintiff as alleged above. Said discrimination was based on Defendant's failure to reasonably accommodate Plaintiff, disparate treatment, retaliation, and a hostile work environment.

185.    Defendant failed to engage in the interactive process with Plaintiff.

186.    Plaintiff could perform the essential functions of Plaintiff's job with Defendant with or without the reasonable accommodations of allowing Plaintiff to continue to work.

187.    Defendant's refusal to provide reasonable accommodations for Plaintiff's known disabilities constitutes discrimination against Plaintiff due to Plaintiff's disabilities pursuant to ORS 659A.103 et seq.

PAGE 42 – COMPLAINT AND DEMAND FOR JURY TRIAL

188.    As a result, Plaintiff suffered damage and is entitled to the damages and other relief set forth below.

189.    Plaintiff is entitled to equitable relief, including, but not limited to, a declaration that Defendant violated Plaintiff's statutory rights, reinstatement, and an injunction prohibiting further discrimination and retaliation.

190.    Plaintiff is entitled to an award for past lost wages and benefits and future lost earnings, benefits, lost earning capacity, and other compensatory damages for past and future pecuniary losses. Plaintiff should be awarded economic damages in an amount determined fair by a jury.

191.    Plaintiff is entitled to noneconomic damages sufficient to compensate Plaintiff for emotional distress and other nonpecuniary losses in an amount to be proved at trial. Plaintiff should be awarded noneconomic damages in an amount determined fair by a jury.

192.    The court should enter an order declaring that Defendant violated the Oregon Rehabilitation Act.

193.    To the extent any amount awarded to Plaintiff is for damages occurring prior to the entry of judgment, Plaintiff is entitled to an award of pre-judgment interest at the legal rate from the date the damage occurred until the date of judgment.

194.    Pursuant to ORS Chapter 659A and ORS 20.107, Plaintiff is entitled to recover Plaintiff's reasonable attorneys' fees and costs, including expert witness fees.

195.    Plaintiff is entitled to post-judgment interest on all damages, costs, expenses, and fees from the date of judgment until the date paid.

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

## FIFTH CLAIM FOR RELIEF

(Unlawful Employment Practices – ORS 659A.030(1)(b)(f))

196.    Plaintiff realleges Plaintiff all prior relevant paragraphs as if fully set forth herein.

197.    Defendant discriminated against Plaintiff in the terms and conditions of her employment based on sex and gender.

198.    Defendant paid Plaintiff wages at a rate less than it paid to one or more male employees performing similar work, in violation of ORS 6549A.030.

199.    Defendant allowed a gender-discriminatory environment to exist for female employees.

200.    As a result of Defendant's discriminatory conduct, Plaintiff is entitled to economic damages for back pay and front pay, plus pre-judgment interest.

201.    As a further result of Defendant's discriminatory conduction, Plaintiff suffered from humiliation, emotional distress, and loss of enjoyment of life for which she is entitled to be compensated at an amount set by the jury.

202.    Pursuant to ORS 659A.885, Plaintiff is entitled to recover her reasonable attorney fees, costs, and expert fees.

## SIXTH CLAIM FOR RELIEF

(Equal Pay Act of 1963, 29 USC Section 206 (d))

203.    Plaintiff alleges all prior relevant paragraphs as if fully set forth herein.

204.    Upon information and belief, Defendant pays women less than men for comparable and equal work.

205.    Defendant discriminated against Plaintiff on the basis of her sex in violation of the Equal Pay Act of 1963 by paying wages to Plaintiff at a rate less than Defendant paid to one

PAGE 44 – COMPLAINT AND DEMAND FOR JURY TRIAL

or more male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

206.    Defendant's failure to compensate Plaintiff equal to male employees was a willful violation.

207.    Pursuant to 29 USC § 216(3) and 29 USC § 255, Plaintiff is entitled to unpaid wages, as well as pre-judgment interest, and an equal amount as liquidated damages.

208.    Pursuant to 20 USC Section 216(b), Plaintiff is entitled to recover her reasonable attorney fees, costs, and expert fees.

## SEVENTH CLAIM FOR RELIEF

(ORS 652.220 – Oregon's Equal Pay Act)

209.    Plaintiff realleges all prior relevant paragraphs as if fully set forth herein.

210.    Upon information and belief, Defendant has not, in good faith, completed an equal-pay-analysis of Defendant's pay practices within three (3) years before the date that Plaintiff filed this action.

211.    Defendant discriminated against Plaintiff on the basis of her sex in violation of ORS 652.220 by paying Plaintiff wages at a rate less than that paid to a male employee for work of comparable character, the performance of which required comparable skills.

212.    As a result of Defendant's discriminatory pay practices, Plaintiff is entitled to economic damages for discriminatory wages, plus pre-judgment interest, and an equal amount in liquidated damages.

213.    Pursuant to ORS 652.230, Plaintiff is entitled to recover her reasonable attorney fees, costs, and expert fees.

PAGE 45 – COMPLAINT AND DEMAND FOR JURY TRIAL

## EIGTH CLAIM FOR RELIEF

(Unlawful Employment Practices – ORS 659A.199 – Whistleblower)

214. Plaintiff re-alleges all relevant paragraphs above as though fully restated herein.

215. Plaintiff reported to Defendant conduct that Plaintiff believed was evidence of a violation of state or federal law, rule, or regulation. This included reports of sex and gender discrimination and harassment, unlawful pay discrimination based on gender and sex, and the unlawful practice by Defendant to offer gift cards in lieu of paying wages.

216. Defendant discriminated and retaliated against Plaintiff because of the report made by Plaintiff. Defendant's actions violated ORS 659A.199, are an unlawful employment practice, and caused Plaintiff economic and noneconomic damages.

217. As a result, Plaintiff suffered damage and is entitled to the damages and other relief set forth below.

218. Plaintiff is entitled to equitable relief, including but not limited to, a declaration that Defendant violated Plaintiff's statutory rights under ORS 659A.199, and an injunction prohibiting further discrimination and retaliation.

219. Plaintiff is entitled to noneconomic damages sufficient to compensate Plaintiff for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount to be proved at trial. Plaintiff should be awarded noneconomic damages in an amount determined fair by a jury.

220. To the extent any amount awarded to Plaintiff is for damages occurring prior to the entry of judgment, Plaintiff is entitled to an award of pre-judgment interest at the legal rate from the date the damage occurred until the date of judgment.

PAGE 46 – COMPLAINT AND DEMAND FOR JURY TRIAL

221.    Pursuant to ORS Chapter 659A.885 and ORS 20.107, the Plaintiff is entitled to recover her reasonable attorney fees and costs, including expert witness fees.

222.    Plaintiff is entitled to post-judgment interest on all damages, costs, expenses, and fees from the date of judgment until the date paid.

**PRAYER FOR RELIEF**

Plaintiff prays for the following judgment against Defendant:

1.    A sum which will fully compensate Plaintiff for Plaintiff's noneconomic damages in a sum that is just as determined by a jury;

2.    A sum which will fully compensate Plaintiff for Plaintiff's economic damages in a sum that is just as determined by a jury;

3.    Equitable relief, including but not limited to, reinstatement if Plaintiff so chooses;

4.    Liquidated damages;

5.    Plaintiff's costs and disbursements incurred herein;

6.    Plaintiff's attorney fees; and

7.    For such other and further relief as the Court may deem just and equitable.

**Plaintiff demands a trial by Jury.**

Dated: June 12, 2024

Law Offices of Daniel Snyder

*/s/ Daniel Snyder*

Daniel Snyder, OSB No. 783856
dansnyder@lawofficeofdanielsnyder.com
Paul Bastian, OSB No. 062706
paul@lawofficeofdanielsnyder.com
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617

PAGE 47 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Offices of Daniel Snyder
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

Facsimile: (503) 241-2249
Attorneys for Plaintiff

PAGE 48 – COMPLAINT AND DEMAND FOR JURY TRIAL

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249